J-A08015-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| M.H.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.K.L. | : | No. 1308 WDA 2018 |

Appeal from the Order Entered August 13, 2018
In the Court of Common Pleas of Allegheny County
Family Court at No(s):  FD17-007022-016

BEFORE:  PANELLA, P.J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY PANELLA, P.J.:                    FILED JUNE 11, 2019

Appellant, M.H.L. ("Father"), files this appeal from the order dated August 13, 2018, and filed August 16, 2018,[1] awarding the parties shared legal custody, M.K.L. ("Mother") primary physical custody, and Father partial physical custody of their children, B.L., M.L., and E.L. (collectively, the "Children").  After careful review, we affirm the trial court's order.

The trial court summarized the relevant procedural history as follows:

_____

[1] While the docket reflects a filed date of August 16, 2018, there is no notation on the docket that notice was given and that the order was entered for purposes of Pa.R.C.P. 236(b).  See Frazier v. City of Philadelphia, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); see also Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)"). Thus, the appeal period was not triggered.  Although we consider the matter on the merits, we caution the Court of Common Pleas of Allegheny County as to compliance with the rules with regard to the entry of orders.

The parties have litigated extensively regarding this matter. Father filed an Emergency Petition for Special Relief, which was granted on January 26, 2017. The resultant Order stated Mother could not relocate the children outside of Allegheny County and that the parties were to proceed through Generations. An Interim Physical Custody Order was entered on February 6, 2017 for shared custody of the Children on a rotating three (3) week basis. Under this Order, Father had physical custody from Thursday after school until Sunday at 6 p.m., for the first two (2) weeks. On Wednesdays of his off-week, Father had physical custody of the Children after school until the start of school on Thursday. Mother had physical custody at all other times.

Following a failed conciliation, the case was to be scheduled for psychological evaluations by an Order dated March 20, 2017. Mother presented two (2) Petitions for Special Relief on March 29, 2017, and Father presented one (1). The resultant Orders of the same date granted that the Children may attend summer camp, and that the parties would begin immediately using My Family Wizard for all non-emergency communications. Father's vacation time with the Children was also outlined in the Orders.

On April 17, 2017[,] psychological evaluations were ordered. Father filed a Petition for Special Relief on June 19, 2017, and Mother was ordered to provide Father a date for makeup custody. Father amended his Counterclaim to include a claim for primary physical custody on July 14, 2017.

Mother filed an Emergency Petition for Special Relief on July 19, 2017 regarding a trip to Washington[,] D.C. that Father wanted to take the Children on. During the trip, Father would be required to attend a conference that the Children would not be able to accompany him to. In the Order, Father was ordered to provide child care arrangements for the Children during that time.

Dr. Neil Rosenblum was appointed to conduct the evaluation. Dr. Rosenblum's report and recommendation was released on July 31, 2017. Dr. Rosenblum recommended an alternating weekend schedule with Children spending long weekends with Father from Thursday night through Monday morning. Father would have the Children for ten (10) of twenty-eight (28) nights.

On October 2, 2017, Mother presented a Petition for Special Relief requesting that Dr. Rosenblum re-interview the parties and

supplement his July 31, 2017 report. Mother contended that Father's recent behavior negatively affected the Children's relationship with Father. By Order dated October 2, 2017, Dr. Rosenblum was appointed to re-interview the parties and anyone else he deemed appropriate. Following those interviews, he was to issue a supplement to his July 31, 2017 report. In his supplemental report, Dr. Rosenblum again recommended alternating weekends, but from Friday through Sunday evenings as opposed to the long weekends that he had previously recommended. He also recommended a Thursday night dinner or overnight option.

Trial Court Opinion, 10/17/18, at 1-3 (footnote omitted); see also Findings of Fact, 8/15/18, at 1-3.

The trial court conducted a custody hearing on July 30, 2018 and July 31, 2018. Mother and Father, both represented by counsel, each testified on their own behalf. Father additionally presented the testimony of an electrician, a neighbor, and Sergeant John Burkett, a police officer with the Edgeworth Police Department. Mother presented the testimony Neil Rosenblum, Ph.D., a clinical psychologist and administrative partner of Allegheny Forensics Associates, who conducted two psychological evaluations for custody.[2] Dr. Rosenblum was accepted by the court as an expert over the objection of counsel for Father. See N.T., 7/31/18, at 387-88. The court also interviewed the children in camera in the presence of both counsel. See N.T., 7/30/18, at 143-71.

_____

[2] Dr. Rosenblum's initial evaluation, dated July 31, 2017, was admitted as Mother's Exhibit N. Dr. Rosenblum's second or supplemental evaluation, dated December 26, 2017, was admitted as Mother's Exhibit O.

By order dated August 13, 2018, and filed August 16, 2018, the trial court awarded the parties shared legal custody of the Children. See Final Custody Order, 8/16/18, at ¶ 2. The court further awarded Mother primary physical custody and Father partial physical custody every other weekend from Friday after school until Sunday at 6:00 p.m. and Thursdays after school until 9:00 p.m. See id. at ¶ 1. The court additionally provided for a vacation and holiday schedule; daily telephonic and electronic contact with the Children; as well as continued family counseling and co-parenting counseling. See id. at ¶¶ 6, 11, 12, 13, 14. Notably, the court further issued Findings of Fact, also dated August 13, 2018, and filed August 15, 2018, which addressed each of the custody factors pursuant to Section 5328(a). See Findings of Fact, 8/15/18, at 3-17.

On September 12, 2018, Father, through counsel, filed a notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Thereafter, the trial court issued an opinion filed October 17, 2018.[3]

On appeal, Father raises the following issues for our review:

_____

[3] Subsequent to this appeal, Mother filed an Emergency Petition resulting in orders dated September 20, 2018 and October 11, 2018, which Father appealed. This appeal was docketed at Superior Court No. 1494 WDA 2018 and consolidated with the instant appeal sua sponte. Pursuant to a per curiam order dated April 3, 2019, and by agreement of the parties, the appeal docketed at 1494 WDA 2018, was remanded for further proceedings and jurisdiction of this Court was relinquished. See Order, 4/3/19.

- 4 -

1. The [c]ourt erred in appointing Dr. Rosenblum as a custody evaluator as Dr. Rosenblum was not qualified to perform custody evaluations;

2. The [c]ourt erred in ordering two custody evaluations, and subjecting the Children to the same;

3. The [c]ourt erred in allowing Dr. Rosenblum to conduct the second custody evaluation as he was not qualified to perform custody evaluations;

4. The [c]ourt erred in failing to strike Dr. Rosenblum's reports and/or testimony;

5. The [c]ourt erred in allowing Dr. Rosenblum to testify as Dr. Rosenblum was not competent to testify;

6. The [c]ourt erred in allowing Dr. Rosenblum to testify in this matter as Dr. Rosenblum was not qualified to testify;

7. The [c]ourt erred in awarding primary custody to Mother;

8. The [c]ourt erred in fashioning a custody schedule that deprived the Children of significant time with their Father, specifically in providing only four (4) overnights per month to Father;

9. The [c]ourt erred in failing to enter the Custody Order with a custody schedule that was in the best interest of the Children;

10. The [c]ourt erred in relying heavily on the Children's preference in fashioning his Order;

11. The [c]ourt erred in [] failing to award equally shared or primary physical custody to Father;

12. The [c]ourt failed to consider all factors under the custody statute in fashioning its Custody Order;

13. The [c]ourt erred in finding that Mother is more likely than Father to encourage and permit frequent and continuing contact between the children and the other parent;

14. The [c]ourt erred in finding that Father does not encourage the children to contact Mother;

15. The [c]ourt erred in relying on the children's testimony primarily to reach the conclusion that Father does not encourage the children to contact Mother;

16. The [c]ourt erred in finding that while Father permits the children to contact Mother, he does so in a manner that is disapproving, which causes undue stress on the children;

17. The [c]ourt erred in finding that the children expressed a well-reasoned preference to spend more time with Mother;

18. The [c]ourt erred in finding that the children are mature in judgment and their judgment is sound;

19. The [c]ourt erred in finding that the children are not ready to have a shared physical custody relationship with Father;

20. The [c]ourt erred in its finding that neither parties' conduct was an intentional attempt to turn the children against the other parent;

21. The [c]ourt erred in failing to conclude that Mother's conduct was an intentional attempt to turn the children against Father;

22. The [c]ourt erred in making a finding that the children's exposure to certain events was not an intentional act by either party to alienate the children from the other parent;

23. The [c]ourt erred in failing to recognize Mother's deliberate attempts to alienate the children from Father;

24. The [c]ourt erred in finding that Mother is more likely than Father to provide for the children's emotional needs;

25. The [c]ourt erred in finding that Father is unable to meet the children's emotional needs at this time;

26. The [c]ourt erred in finding that Mother is more likely than Father to attend to the children's emotional and special needs;

27. The [c]ourt erred in finding that Mother is more likely than Father to meet the children's daily emotional needs;

28. The [c]ourt erred in finding that Father struggles to meet the children's special and emotional needs;

29. The [c]ourt erred in finding that Mother has shown a willingness and ability to cooperate with Father;

30. The [c]ourt erred in finding that Father has the ability to cooperate with Mother, but he rarely shows a willingness to do so;

31. The [c]ourt erred in finding that Father harbors resentment towards Mother, which impedes his ability to co-parent;

32. The [c]ourt erred in finding no compelling evidence was presented at either party, or a member of their household had a history of abusing drugs or alcohol;

33. The [c]ourt erred in finding that no evidence was presented that either party, or a member of their household, has a mental or physical condition;

34. The [c]ourt erred in ignoring the evidence offered of Mother's depression, instability and the need for medication therefore; and,

35. Plaintiff reserves the right to raise additional matters complained of on appeal following examination of the trial transcript.

Concise Statement of Errors Complained of on Appeal, 9/12/18.[4]

However, prior to examining Father's claims on appeal, we address Mother's claims of deficiencies in Father's brief. Specifically, Mother challenges Father's brief as it relates to his Statement of Questions Involved. See Mother's Brief at 1-2.

_____

[4] Father does not specifically delineate the issues he wishes to raise in the Statement of Questions Involved section of his brief. Rather, he instead references his Rule 1925(b) statement. See Father's Brief at 10. Father states,

> Appellant hereby refers to and incorporates his Concise Statement of Errors Complained Of On Appeal Pursuant to Pa. R.C.P. 1925(b) Dated September 12, 2018 (Appendix C) . . . for a precise statement of the issues involved in these consolidated appeals for brevity's sake and in deference to the page limit provided by the Rules of Appellate Procedure.

Id. We observe that Father additionally included two supplementary issues germane to the subsequent appeal, which, as noted above, was remanded by agreement. See id.

- 7 -

Our Rules of Appellate Procedure establish and set forth in detail the specifics as to each of the required sections of a brief. See Pa.R.A.P. 2114-2119. Of particular importance, an appellant must include a statement of questions involved. See Branch Banking & Trust v. Gesiorski, 904 A.2d 939, 942 (Pa. Super. 2006); Commonwealth v. Maris, 629 A.2d 1014, 1016 (Pa. Super. 1993). Rule 2116 addresses the statement of questions involved and provides as follows:

> (a) General rule.—The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail. The statement will be deemed to include every subsidiary question fairly comprised therein. No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby. Each question shall be followed by an answer stating simply whether the court or government unit agreed, disagreed, did not answer, or did not address the question. If a qualified answer was given to the question, appellant shall indicate the nature of the qualification, or if the question was not answered or addressed and the record shows the reason for such failure, the reason shall be stated briefly in each instance without quoting the court or government unit below.

We have held that an appeal may be dismissed or quashed where the deficiencies of an appellant's brief are such that we are unable to conduct a meaningful review. See Karn v. Quick & Reilly, Inc., 912 A.2d 329, 337 (Pa. Super. 2006); Branch Banking & Trust, 904 A.2d at 943; Maris, 629 A.2d at 1017. As we indicated in Maris:

> "This Court possesses discretionary authority to quash, dismiss or deny allowance of appeal based upon the substantial defects of appellant's brief. Pa.R.A.P. 2101." Commonwealth v. Ely, 381 Pa. Super. 510, 513, 554 A.2d 118, 119 (1989). . . . "We decline to become appellant's counsel. When issues are not properly

- 8 -

> raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review a Court will not consider the merits thereof." Sanford, supra, 299 Pa. Super. at 67, 445 A.2d at 150.

Id. at 1017.

Instantly, Father's Statement of Questions Involved refers to his Statement of Errors Complained of on Appeal. See Father's Brief at 10. Moreover, Father's Statement is lengthy, and Father does nothing to focus and/or consolidate the issues where appropriate.

Although Father's brief may not be in conformity with Pennsylvania Rule of Appellate Procedure 2116, the defects do not hamper meaningful review of several issues raised by Father. Both Mother and the trial court responded to issues raised by Father. As we are able to discern Father's arguments on these issues, we decline to dismiss or quash Father's appeal. Similarly, despite the voluminous nature of Father's Statement of Errors Complained of on Appeal, we likewise decline to find waiver. Tucker v. R.M. Tours, 939 A.2d 343, 346 (Pa. Super. 2007). However, to the extent that Father wished to raise issues that are not addressed in this memorandum, we find Father has waived such issues due to the deficiencies in his brief.

We do caution Father's counsel regarding appellate strategy. Raising so many issues reminds us of Justice Robert H. Jackson's warning:

> Legal contentions, like the currency, depreciate through overissue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at a lack of confidence in any one. Of

course, I have not forgotten the reluctance with which a lawyer abandons even the weakest point lest it prove alluring to the same kind of judge. But experience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.

Ruggero J. Aldisert, J. "Winning on Appeal: Better Briefs and Oral Argument," at 130 (2d ed. 2003) (quoting Robert H. Jackson, "Advocacy Before the United States Supreme Court," 37 Cornell L.Q. 1, 5 (1951)).

This "much quoted" advice, unfortunately, "often 'rings hollow'...." Commonwealth v. Robinson, 864 A.2d 460, 480 n.28 (Pa. 2004) (citing Ruggero J. Aldisert, J. "The Appellate Bar: Professional Competence and Professional Responsibility—A View From the Jaundiced Eye of the Appellate Judge," 11 Cap. U.L. Rev. 445, 458 (1982)). But its importance cannot be overstated. See, e.g., Jones v. Barnes, 463 U.S. 745, 751-752 (1983) ("Experienced advocates since time beyond memory emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."); Howard v. Gramley, 225 F.3d 784, 791 (7th Cir. 2000) ("[O]ne of the most important parts of appellate advocacy is the selection of the proper claims to urge on appeal. Throwing in every conceivable point is distracting to appellate judges, consumes space that should be devoted to developing the arguments with some promise, inevitably clutters the brief with issues that have no chance ... and is overall bad appellate advocacy."); Aldisert, supra at 129 ("When I read

an appellant's brief that contains more than six points, a presumption arises

that there is no merit to any of them.")

Turning to Father's issues on appeal, we group Father's issues into two

main categories: (1) a challenge to the appointment and testimony of Dr.

Rosenblum; and (2) a challenge to the award of primary physical custody to

Mother.

In custody cases under the Child Custody Act, ("the Act"), 23 Pa.C.S.A.

§§ 5321-5340, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type
> and our standard is abuse of discretion. We must accept findings
> of the trial court that are supported by competent evidence of
> record, as our role does not include making independent factual
> determinations. In addition, with regard to issues of credibility
> and weight of the evidence, we must defer to the presiding trial
> judge who viewed and assessed the witnesses first-hand.
> However, we are not bound by the trial court's deductions or
> inferences from its factual findings. Ultimately, the test is whether
> the trial court's conclusions are unreasonable as shown by the
> evidence of record. We may reject the conclusions of the trial
> court only if they involve an error of law, or are unreasonable in
> light of the sustainable findings of the trial court.

C.R.F. v. S.E.F., 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted); see

also E.R. v. J.N.B., 129 A.3d 521, 527 (Pa. Super. 2015).

This Court consistently has held:

> [t]he discretion that a trial court employs in custody matters
> should be accorded the utmost respect, given the special nature
> of the proceeding and the lasting impact the result will have on
> the lives of the parties concerned. Indeed, the knowledge gained
> by a trial court in observing witnesses in a custody proceeding
> cannot adequately be imparted to an appellate court by a printed
> record.

Ketterer v. Seifert, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting Jackson v. Beck, 858 A.2d 1250, 1254 (Pa. Super. 2004)). In addition,

> [a]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

M.A.T. v. G.S.T., 989 A.2d 11, 18-19 (Pa. Super. 2010) (en banc) (citations omitted).

Father's issues 1 through 6 all raise claims of error as to Dr. Rosenblum and his custody evaluations. Father asserts that the trial court erred in appointing Dr. Rosenblum to conduct a custody evaluation, in ordering Dr. Rosenblum conduct a second custody evaluation, and in accepting Dr. Rosenblum's testimony as an expert witness. See Father's Brief at 23-35. Specifically, Father claims the second custody evaluation was ordered based on the "exaggerated and mischaracterized allegations" Mother raised in her Petition for Special Relief. Id. at 25-28. He further takes issue with Dr. Rosenblum's competence to testify as an expert witness based on his past history of disciplinary action. See id. at 28-35.

As these issues involve pure questions of law, our standard of review is de novo, and our scope of review is plenary. See Gilbert v. Synagro Cent., LLC, 131 A.3d 1, 10 (Pa. 2015); Harrell v. Pecynski, 11 A.3d 1000, 1003

(Pa. Super. 2011); In re Wilson, 879 A.2d 199, 214 (Pa. Super. 2005) (en banc) (citations omitted).

First, Father contends the trial court erred in qualifying Dr. Rosenblum as an expert.

> "Whether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court." Kovalev v. Sowell, 839 A.2d 359, 362–363 (Pa. Super. 2003) (citation omitted). "It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. When determining whether a witness is qualified as an expert the court is to examine whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation." Id. (citations omitted).
>
> The determination of whether a witness is a qualified expert involves two inquiries: When a witness is offered as an expert, the first question the trial court should ask is whether the subject on which the witness will express an opinion is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman.... If the subject is of this sort, the next question the court should ask is whether the witness has sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth. Sowell, 839 A.2d at 363 (citations and quotation marks omitted).

Seels v. Tenet Health Sys. Hahnemann, LLC, 167 A.3d 190, 200–01 (Pa. Super. 2017). Further, "the weight to be given to such testimony is for the trier of fact to determine." Miller v. Brass Rail Tavern, Inc., 664 A.2d 525, 528 (Pa. 1995).

Father does not challenge the court's conclusion that custody evaluations are a subject that is appropriate for expert opinion. Instead,

Father's argument focuses on Dr. Rosenblum's qualifications to provide an opinion that would aid in the search for truth on the issue of custody.

In response to Father's challenge on appeal, the trial court writes,

Dr. Rosenblum is undoubtedly qualified as an expert in psychological custody evaluations. As such, Dr. Rosenblum is qualified to author custody evaluation reports and testify to the same. Dr. Rosenblum has been a clinical psychologist for forty (40) years, and is partnered with the Allegheny Forensics Associates. The program holds a contract with the Allegheny County Court of Common Pleas Family Division to perform custody evaluations.

Father contends that because Dr. Rosenblum was disciplined by the State Board of Psychology he is not qualified to testify as an expert. Father's contention is without merit. First, the occasion on which Dr. Rosenblum was punished by the State Board of Psychology was based on a custody evaluation he performed wherein he did not interview both parents. In this case, Dr. Rosenblum individually interviewed Mother, Father, and the three (3) children for both the first and second evaluations.

Second, and more importantly, it is within the liberal discretion of the Court to qualify an expert. The [c]ourt focused on Dr. Rosenblum's extensive experience in conducting psychological custody evaluations. The [c]ourt considered the disciplinary actions when deciding whether or not to qualify Dr. Rosenblum as an expert. Similarly, Dr. Rosenblum was undoubtedly qualified to perform the second evaluation just as he was the first because his qualifications did not change between the time of the first and second evaluations.

Trial Court Opinion, 10/17/18, at 4-5 (citations to record omitted).

We can find no error or abuse of discretion in the trial court's reasoning. The disciplinary proceedings against Dr. Rosenblum did not alter his specialized knowledge on the issue of custody. As the trial court held, those proceedings are relevant only to the weight, not the admissibility, of Dr.

- 14 -

Rosenblum's opinions. Accordingly, Father's challenge to the court's qualification of Dr. Rosenblum as an expert witness merits no relief.

Next, Father challenges the trial court's decision to order a second custody evaluation. "Pa.R.C.P. 1915.8(a) provides the court discretion as to whether to order the child or a party to submit to an evaluation by an appropriate expert." Jordan v. Jackson, 876 A.2d 443, 455 (Pa. Super. 2005) (citation and internal quotation marks omitted).

The trial court describes its rationale for the second custody evaluation:

> In this case, the second psychological evaluation was ordered following Mother's October 2, 2017 Petition for Special Relief due to significant events that the [c]ourt felt potentially changed the Children's relationship with the parties. The events alleged in the Petition include, but are not limited to, Father's road rage incident with the Children in the car, Father screaming at [B.L.] in full view of the other Children, and Father spitting on Mother's sidewalk and raising his middle finger when he passes Mother's house.

> In light of these allegations the [c]ourt determined that another psychological evaluation was appropriate to determine if the Children's relationship with Father had materially changed since the first evaluation was conducted. Just as ordering the first evaluation was in the [c]ourt's sound discretion, ordering the second evaluation was in its sound discretion.

Trial Court Opinion, 10/17/18, at 5-6 (citations to record omitted).

Once again, we can find no error or abuse of discretion in the trial court's reasoning. The court, cognizant of its duty to serve the best interests of the Children, sought an updated opinion after Mother alleged a change in the relationships between the Children and Father. Father's second argument merits no relief.

In Father's second broad category of arguments, issues 7 through 35, Father repeatedly claims that the trial court erred in awarding primary physical custody to Mother and reducing his periods of physical custody. Father argues that the custody factors and the Children's best interests suggest an award of shared physical custody. See Appellant's Brief at 35-36.

The paramount concern in any custody case decided under the Act is the best interests of the child. See 23 Pa.C.S.A. §§ 5328, 5338. The Act provides for custody arrangements ranging from sole physical custody in one adult to equally shared physical custody between parties. See 23 Pa.C.S.A. § 5323(a).

Father argues,

[t]he [c]ourt abused its discretion reducing Father's periods of physical custody and in awarding Mother primary physical custody of the Children as all of the sixteen (16) best interest factors favor an award of shared physical custody. The custody schedule established by the Court provides the Children with only four (4) overnights per month with Father. This schedule is not in the best interest of the Children as it deprives them of spending significant time with their Father. It is in the best interest of the Children to spend an equal amount of time with both of their parents based on a shared custody schedule.

Id. at 36. Specifically, Father claims that the trial court erred in its analysis of multiple factors under section 5328(a). See id. at 37-62.

Section 5328(a) sets forth the best interest factors that the trial court must consider. See E.D. v. M.P., 33 A.3d 73, 79-80 n.2 (Pa. Super. 2011).

All of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order. . . .

> The record must be clear on appeal that the trial court considered all the factors.
>
> Section 5323(d) provides that a trial court shall delineate the reasons for its decision on the record in open court or in a written opinion or order. Additionally, section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen section 5328(a) custody factors prior to the deadline by which a litigant must file a notice of appeal." . . .
>
> In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d).

A.V. v. S.T., 87 A.3d 818, 822-23 (Pa. Super. 2014) (emphasis in original; citations and internal quotation marks omitted).

The trial court is required to consider all of the Section 5328(a) factors in entering a custody order. See J.R.M. v. J.E.A., 33 A.3d 647, 652 (Pa. Super. 2011). Although the court is required to give "weighted consideration to those factors which affect the safety of the child" pursuant to section 5328(a), the amount of weight a court gives any one factor is almost entirely discretionary. M.J.M. v. M.L.G., 63 A.3d 331, 339 (Pa. Super. 2013). Critically, as we stated in M.J.M.:

> It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case. See A.D. v. M.A.B., 989 A.2d 32, 35-36 (Pa. Super. 2010) ("In reviewing a custody order . . . our role does not include making independent factual determinations. . . . In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand").

- 17 -

Id. (emphasis added).

First, Father argues the trial court abused its discretion when it found that Mother was the more likely party to encourage frequent contact with the other parent. See 23 Pa.C.S.A. § 5328(a)(1). On this factor, the court made the following findings of fact:

14. The [c]ourt finds that Mother is more likely than Father to encourage and permit frequent and continuing contact between the Children and the other parent. The [c]ourt finds that Father permits contact between the Children and Mother during his custody time. The [c]ourt finds, however, that Father does not encourage the Children to contact Mother.

15. [B.L.] credibly testified that Mother prompts the Children to call and text Father. [B.L.] further testified that Mother "gives [the Children] the option of walking over [to Father's house]."

16. [E.L.] credibly testified that Mother wants the Children to have a good relationship with Father. [E.L.] also credibly testified that Mother tells the Children "to be nicer to [Father] and talk to [Father] more."

17. [M.L.] credibly testified that he calls and text messages Father on a daily basis when he is in Mother's care. [M.L.] credibly testified that he enjoys calling Father.

18. [B.L.] and [E.L.] credibly testified that they rarely respond to Father's phone calls and text messages. [B.L.] credibly testified that he does not respond to Father [sic] calls and messages because he does not "want to deal with anyone" and because Father "turns [their] conversations into discussions about religion or custody." [E.L.] testified that she calls Father back "sometimes" but does not always call him back "at night because [she is] too tired."

19. [B.L.] and [E.L.] both credibly testified that Father does not encourage their relationship with Mother. [M.L.] credibly testified that he is not sure if Father encourages the Children's relationship with Mother because "[Father] never says anything to [him]."

- 18 -

20. [E.L.] credibly testified that Father does not say anything positive about Mother and that Father calls Mother "a liar." [E.L.] also credibly testified that Father will ask her about "what [she] is texting to [Mother] and what [Mother] is saying back."

21. Mother credibly testified that Father allows the Children to visit her home during his custody time but only to retrieve something that they forgot. Mother further credibly testified that the Children are permitted to stay for approximately ten (10) minutes per visit. Mother credibly testified that the Children "feel pressured to return [to Father's home] and they watch the clock and they get text messages [from Father]."

22. Dr. Neil Rosenblum opined that the Children do not feel comfortable calling or texting Mother in Father's presence. Dr. Rosenblum further opined that the Children seek the privacy of their bedrooms when they want to speak to Mother during Father's custody time[.]

23. The [c]ourt finds that while Father permits the Children to contact Mother, he does so in a manner that is disapproving, which causes undo [sic] stress on the Children.

Findings of Fact, 8/13/18, at 3-5. The certified record supports these findings, and the court's conclusions based on these findings are reasonable. Father's arguments on appeal all amount to challenges to the trial court's credibility determinations. As we do not make independent factual determinations on appeal, Father's challenge to this factor merits no relief. See C.R.F. v. S.E.F., 45 A.3d 441, 443 (Pa. Super. 2012).

Next, Father challenges the court's determination that the Children expressed a well-reasoned preference for Mother to have physical custody. See 23 Pa.C.S.A. § 5328(a)(7). Once again, the trial court provided comprehensive findings of fact on this factor:

40. The [c]ourt finds that the Children expressed a well-reasoned preference to spend more time with Mother. The [c]ourt further finds that the Children are mature and their judgement is sound.

41. [B.L.] (age 15) credibly testified that he does not want to spend more time with Father. [B.L.] credibly testified that Father makes him uncomfortable by talking about "problems that Mom has." He testified that Father also makes him uncomfortable when he "gets mad in the moment and says stuff in front of [his] friends." [B.L.] credibly testified that he does not like it when Father asks him how often he prays or when he asks him about the church he attends with Mother. He credibly testified that he and Father have "fights" regarding religion. [B.L.] testified that Mother and Father have different religions. He credibly testified that the Children like Mother's church better than Father's. [B.L.] credibly testified that Father makes comments about their religion "being odd", which is upsetting to him.

42. [M.L.] (age 14) credibly testified that he does not like the current custody schedule. He further testified that he would like "more weekend time with [Mother]." [M.L.] credibly testified that he "has fun with [Father] on the weekends but [the Children] do more things with [Mother]." [M.L.] credibly testified that he is more comfortable with Mother because she was "always there for [him] while [Father] was working."

43. [E.L.] (age 13) credibly testified that "it would be nice to have more weekends with [Mother] because of church…" She credibly testified that she does not have a preference as to the days that she sees Father. [E.L.] credibly testified that she is "used to going to [Mother]" with her concerns. She testified that "talking to [Father] is awkward because [Father] was always gone while [Mother and Father] were married."

44. Dr. Rosenblum testified that he conducted the first evaluation interviews with the [L.] family in June and July of 2017. Dr. Rosenblum opined that the Children "felt strongly that they did not have enough weekend time with [Mother]."

45. Dr. Rosenblum opined that the Children were still adjusting to Mother and Father's separation. He further opined that the Children felt that Father was attacking Mother and the Children because of their religion. He opined that the Children felt that Father "does not understand or respect their feelings or desires."

46. Dr. Rosenblum opined that at the time of the first evaluation, the Children expressed "legitimate concerns" regarding Father's behavior, however, he was "impressed with [Father's] ability to adjust to a more hands-on role with [the Children]." He further testified that it was his "hope that [Father] would listen to [the Children] more than focus on a shared custody schedule."

47. At the conclusion of his first evaluation, Dr. Rosenblum opined that "this is not a 50/50 shared custody case" because "[the [Children] simply feel more secure with [Mother]." He recommended within in his first evaluation report dated July 31, 2017, Defendant's Exhibit N, that Mother exercise primary physical custody of the Children subject to Father's periods of partial physical custody every other Friday night to Monday morning, and every Thursday night to Friday morning.

48. Dr. Rosenblum testified that only three (3) months had lapsed after the conclusion of the first evaluation when the parties' were ordered to engage in updated psychological evaluations. Within that three (3)[-]month timeframe, Dr. Rosenblum opined that "a series of events occurred with [Father], which led to a deterioration of [Father] and [the Children's] relationship." Dr. Rosenblum testified that the majority of the events were related to Father's discussions with the Children regarding his desire to achieve shared physical custody, Father's dislike of Mother and the Children's religion and Father's negative comments about Mother to the Children. He opined that Father's conduct is "self-defeating" because "he knows that [the Children] do not want shared custody and his efforts to force this arrangement creates a further divide between him and [the Children]."

49. Dr. Rosenblum further opined that Father's actions "fueled [the Children's] concerns that [Father] does not listen or care about their needs or desires." Dr. Rosenblum opined that "[Father] is not a bad guy[, and that in] fact, he is a good guy that loves [the Children], but [Father] does not understand that attacking [Mother] is hurting his relationship with [the Children] and by pushing for shared custody is hurting their relationship."

50. Dr. Rosenblum noted that the Children are now teenagers and the need for Father to compromise with the Children is imperative in order to promote their relationship. Dr. Rosenblum opined that

it is "most important for [Father] to not force his will onto [the Children], which will further lead to more deterioration."

51. Dr. Rosenblum opined at the conclusion of the updated evaluation that it is in the best interest of the Children for Father to exercise physical custody every other Friday night to Sunday night. He further opined that it could be advantageous for Father to negotiate with the Children regarding their desire to spend an extra overnight with him on a Thursday or Monday evening. Dr. Rosenblum recommended that Father allow the Children to opt-out of the extra overnight and have dinner together with them instead.

52. Dr. Rosenblum opined that "if 50/50 custody is put in place, [the Children] will react negatively and resist [Father] further." He further opined that "downsizing [Father's] custody time will not hurt [Father's] relationship with [the Children]."

53. Dr. Rosenblum opined in his evaluation and report dated December 26, 2017, Defendant's Exhibit O, that "it is most important that the Children continue in their family therapy with Tammy Rink, with both Mother and Father alternating taking the Children to the therapy sessions. Mother and Father should be able to have occasional individual appointments with Ms. Rink as well."

54. Mother credibly testified that the Children and Father are receiving family counseling with Tammy Rink. The Children credibly testified that the counseling sessions are not going well because "nothing changes" and it "has not helped." [B.L.] credibly testified that they have not gone to counseling "for about three months." Mother credibly testified that on average, the Children and Father see Ms. Rink "once a month but not every month." The [c]ourt finds that the parties are not attending family counseling enough given the level of tension between Father and the Children's relationship.

55. The [c]ourt finds that the Children are not ready to have a shared physical custody relationship with Father. The [c]ourt finds that consistent family therapy sessions with Tammy Rink, or any other trained professional, will likely promote Father's relationship with the Children.

Findings of Fact, 8/13/18, at 7-11. As before, these findings are all well supported by the certified record. Father first asserts that the trial court placed too much weight on this factor. As noted in our standard of review, the trial court has broad discretion in determining which factors are most important in each individual case. As we cannot conclude the trial court abused its discretion in this case, Father's argument merits no relief.

Father also challenges the trial court's findings that the Children's preferences for physical custody with Mother were well-reasoned and mature in judgment. Father's arguments once again request that we overturn well-supported factual determinations. As we cannot do this on appeal, Father's arguments merit no relief.

The third factor subject to Father's attack concerns whether either party has attempted to turn the Children against the other parent. See 23 Pa.C.S.A. § 5328(a)(8). The trial court thoroughly reviewed the evidence on this factor:

> 56. The [c]ourt finds that both parties have engaged in negative conduct towards each other in the presence of the Children. The [c]ourt further finds that neither parties' conduct was an intentional attempt to turn the Children against the other parent.
>
> 57. Mother credibly testified that she told Father in December of 2016 that she wanted a divorce, but she did not leave the marital residence until February 7, 2017. Mother and Father both credibly testified that their separation was difficult and stressful.
>
> 58. Father credibly testified that he was blind-sided by Mother's decision to leave the marriage. Mother credibly testified that she was frustrated with Father for refusing to leave the marital residence. Mother testified that she wanted to remain in the marital residence with the Children because she was the Children's primary caretaker.

59. Father credibly testified that in January of 2017 Mother asked him in the presence of the Children to leave the martial [sic] residence. He further testified that Mother chastised him in front of the Children when he refused to move out. Father testified that Mother was trying to create an "us vs. him" situation, meaning the Children and Mother against Father.

60. Father credibly testified that Mother called the police in January of 2017 when she was unable to find her purse. He credibly testified that Sergeant John Burlett of the Edgeworth Police Department responded to the call. Father credibly testified that the Children were present when the police arrived. Sergeant Burlett testified that Mother wanted the police to be present while she checked Father's vehicle for her purse. Sergeant Burlett testified that Father permitted him to search his truck. Sergeant Burlett further testified that Mother's purse was not in Father's vehicle and that Mother called the police station back later that evening to let him know that she found her purse. Mother credibly testified that she was under a lot of stress and she forgot that she had hidden her purse in the house.

61. Mother credibly testified that in January of 2017, Father damaged pictures of her located within the martial [sic] residence. Mother presented a collection of photos, Defendant's Exhibit A, which show Mother's face and eyes scratched out in a number of family photos. Mother credibly testified that after the photos were damaged, they were put back into their frame and redisplayed where they were originally kept at the martial [sic] residence. Mother credibly testified that the Children were able to see the damaged photographs.

62. The [c]ourt finds that the Children were exposed to a number of events during which the parties treated each other poorly. The [c]ourt finds that the majority of the events occurred during the parties' initial period of separation, which was a stressful time for the entire family. The [c]ourt further finds that the Children's exposure to certain events was not an intentional act by either party to alienate the Children from the other parent.

Findings of Fact, 8/13/18, at 11-13. These findings are all well-supported by

the certified record. Father's challenges to this factor all amount to challenges

to the trial court's credibility and factual findings. For example, Father argues that the court erred in finding that Mother's conduct was not an intentional attempt to alienate the Children from Father. As we can find no abuse of the court's discretion, Father's arguments on this factor merit no relief.

Father next contends the trial court erred in concluding that Mother is more capable of meeting the Children's emotional needs. See 23 Pa.C.S.A. § 5328(a)(9). On this factor, the court found:

> 63. The [c]ourt finds that both parties are able to maintain a loving, stable consistent and nurturing relationship with the Children. The [c]ourt further finds that Mother is more likely than Father to adequately provide for the Children's emotional needs.
>
> 64. As discussed supra under Factor 7, the Children credibly testified that they feel more comfortable with Mother than they do with Father. Dr. Rosenblum opined that the Children feel that "[Father] doesn't listen or care about their needs or desires."
>
> 65. Father credibly testified that he does not take responsibility for the deterioration of his relationship with the Children. Father testified that it is Mother's fault that the Children do not respond to his communications. Dr. Rosenblum opined that "if [Father] continues to feel that he is doing, nothing wrong, things probably will not improve."
>
> 66. The [c]ourt finds that Father is unable to meet the Children's emotional needs at this time. The [c]ourt further finds that consistent family therapy with the Children will likely assist Father in achieving the goal of meeting their emotional needs.

Findings of Fact, 8/13/18, at 13. These findings all find substantial support in the certified record. Father argues the court erred in placing any emphasis on Mother's history of being the primary caretaker of the children.

While the primary caretaker doctrine is no longer viable, a court may still consider a parent's role as primary caretaker in its consideration of the custody factors.

> We hasten to add that this conclusion does not mean that a trial court cannot consider a parent's role as the primary caretaker when engaging in the statutorily-guided inquiry. As discussed above, a trial court will necessarily consider a parent's status as a primary caretaker implicitly as it considers the section 5328(a) factors, and to the extent the trial court finds it necessary to explicitly consider one parent's role as the primary caretaker, it is free to do so under subsection (a)(16).

M.J.M., 63 A.3d at 339. Here, Mother's role as the Children's primary caretaker was certainly relevant to the issue of which parent was better equipped to address the Children's emotional needs.

Father also challenges the court's conclusion that he has deficiencies in his ability to address the Children's emotional needs. Once again, Father asks us to engage in second-guessing the trial court's factual determinations. As we do not make independent factual determinations, Father's arguments merit no relief.

In his next argument, Father challenges the trial court's conclusion that Mother is more likely to attend to developmental and medical needs of the Children. See 23 Pa.C.S.A. § 5328(a)(10). On this issue, the trial court found:

> 67. The [c]ourt finds that both parties are likely to attend to the Children's daily physical, developmental and educational needs.
>
>  ...
>
> 71. Mother credibly testified that the Children have a number of special medical needs.   She credibly testified that all three (3)

- 26 -

children routinely visit a pediatrician, dentist and orthodontist. Mother credibly testified that "[M.L.] and [E.L.] see an eye doctor", "[B.L.] sees a heart doctor once a year" and "[M.L.] sees an endocrinologist once a year." She credibly testified that "[B.L.] has Lyme Disease... [and] he is prescribed antibiotics when symptoms occur."

72. Mother credibly testified that she schedules all of the Children's medical appointments during her custody time if possible because Father "says not to make appointments on his time." Mother credibly testified that in May of 2017 a wire in the back of [B.L.]'s braces popped out, which caused him discomfort in his mouth. She testified that she made an emergency orthodontist appointment for [B.L.] during Father's custody time, and that Father refused to take [B.L.] to his appointment. Mother further testified that Father also refused to allow her to take him to the scheduled appointment. Mother credibly testified that she had to reschedule [B.L.]'s appointment to a later date during her custody time.

73. The [c]ourt finds that Father struggles to meet the Children's special and emotional needs. The [c]ourt finds that the attached custody Order of Court will ensure that the all of the Children's needs are being met.

Findings of Fact, 8/13/18, at 14-15. The court's findings are all supported by the record. Father argues that the trial court misconstrued the nature of his request to Mother that she not schedule medical appointments during his custodial periods. He contends the court ignored his testimony that he made this request based on Mother's failure to share the contact information for the medical service providers. Father claims he merely desired to be more involved in scheduling the appointments during his custodial periods.

However, this argument at its core is simply another request for this Court to make independent factual findings. The trial court explicitly found Mother's testimony on this issue credible. If we were to grant Father's request

and credit his testimony, we would be overruling the trial court's explicit credibility findings with our own, independent factual findings. Father's arguments on this factor merit no relief.

Next, Father challenges the trial court's conclusion that Mother has a greater capacity and willingness to co-parent the Children. See 23 Pa.C.S.A. § 5328(a)(13). As in all of these issues, the court provided extensive findings of fact:

> 73. The [c]ourt finds that the level of conflict between the parties is high. The [c]ourt finds that Mother has shown a willingness and the ability to cooperate with Father. The [c]ourt finds that Father has the ability to cooperate with Mother, but that he rarely shows a willingness to do so.
>
> 74. Mother credibly testified that she "tries to speak to [Father] about custody issues...but [Father] refuses to acknowledge [her]." She testified that the parties began co-parenting counseling sessions with Dr. Bob Wilson in May of 2018. Mother credibly testified that Father "will not speak to [her] directly at co-parenting counseling sessions either...and [Father] ignores [her] questions."
>
> 75. Father credibly testified that the parties have not had a detailed conservation [sic] since they separated. He testified that the parties only "exchange pleasantries" when they are face-to-face. Father testified that Mother has tried to arrange a "sit-down" conversation, but that Father has not agreed to meet her yet. Father credibly testified that "in time [he] would like to because it is good for the kids."
>
> 76. Father credibly testified that Mother has offered him additional custodial time and she invited him to join her and the Children to see a movie. He testified that he has declined Mother's offers.
>
> 77. The [c]ourt finds that Father harbors resentment towards Mother, which impedes his ability to co-parent. The [c]ourt finds that Mother has made several attempts to resolve the on-going hostility, but that Father has declined her offers to discuss the

- 28 -

matter. The [c]ourt finds that consistent co-parenting counseling sessions will likely improve the parties' relationship.

Findings of Fact, 8/13/18, at 16-17. The certified record provides ample support for these findings.

Father argues the trial court mischaracterized the nature of the disputes between Mother and Father. Father complains that the court accepted Mother's version of the disputes while ignoring his version. Again, Father's argument boils down to a request that we overrule the trial court's credibility determinations. As we will not engage in independent fact-finding, Father's arguments on this factor merit no relief.

Father's final three issues, while styled as challenges to the trial court's consideration of custody factors, are actually challenges to evidentiary rulings made by the court. See Appellant's Brief at 62 (arguing the court erred in sustaining relevancy objections raised by Mother). However, the two paragraphs of argument that support these three issues contain no citations to authority. Nor do they develop any argument to support Father's contention that the trial court erred in sustaining Mother's objections.

"The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." Eichman v. McKeon, 824 A.2d 305, 319 (Pa. Super. 2003). Furthermore, "[w]hen issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review[,] a Court will not consider the merits thereof." Branch Banking &

Trust v. Gesiorski, 904 A.2d 939, 942-943 (Pa. Super. 2006) (citations omitted). As a result of the deficiencies in his brief, Father has waived these issues.

In summary, we interpret the second group of issues raised by Father to be, at their core, a challenge to the trial court's findings of fact and determinations regarding credibility and weight of the evidence. Father, in essence, questions the trial court's conclusions and assessments and seeks this court to re-find facts, re-weigh evidence, and/or re-assess credibility to his view of the evidence. This we cannot do.

We will not disturb the trial court's findings of fact and credibility determinations absent an abuse of discretion. See C.R.F., 45 A.3d at 443; see also E.R., 129 A.3d at 527. As we stated in King v. King, 889 A.2d 630, 632 (Pa. Super. 2005), "It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given [sic] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . ." (quoting Hanson v. Hanson, 878 A.2d 127, 129 (Pa. Super. 2005)). After a thorough review of the record, we find no abuse of discretion.

In the case sub judice, the trial court reasonably analyzed and addressed each factor under Section 5328(a). See Findings of Fact, 8/15/18, at 3-17. After careful review of the record, we determine that the trial court's findings and determinations regarding the custody factors set forth in Section

5328(a) are supported by competent evidence in the record, and we will not disturb them. See C.R.F., 45 A.3d at 443; see also E.R., 129 A.3d at 527. As such, Father's claims are without merit.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/11/2019